UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 2:17-cr-00021-JDL-1 |
| | ) | |
| WILLIE RICHARD MINOR, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION TO DISMISS INDICTMENT**

Defendant Willie Richard Minor is charged with possessing a firearm as a person previously convicted of a misdemeanor domestic violence offense, in violation of 18 U.S.C.A. §§ 922(g)(9) and 924(a)(2)[1] (West 2024). Minor moves to dismiss (ECF No. 292) the superseding indictment (ECF No. 154) asserting that: (1) prosecuting him for allegedly violating section 922(g)(9) unlawfully abridges his right to bear arms protected by the Second Amendment to the United States Constitution, and (2) section 922(g)(9) is unconstitutionally overbroad on its face in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. For the reasons I will explain, I deny the motion to dismiss.

**I. BACKGROUND**

**A.    Predicate Offense and Procedural History**

On October 14, 2009, Minor was arraigned on a one-count criminal complaint

---

[1] This reference to section 924(a)(2) reflects the applicable penalty statue as codified at the time Minor was charged in 2019. When Congress enacted the Bipartisan Safer Communities Act, Pub. L. No. 117-159, § 12004, 136 Stat. 1313, 1329 (2022), the penalty provision applicable to section 922(g) moved from section 924(a)(2) to 924(a)(8), the latter providing a longer maximum period of imprisonment.

1

in state court charging him under 17-A M.R.S.A. § 207-A with domestic violence assault for "intentionally, knowingly, or recklessly caus[ing] bodily injury or offensive contact to B.M." ECF No. 304-1 at 1. The complaint alleged that Minor had committed the charged offense "against a family or household member" as defined by Maine law. ECF No. 304-1 at 1. The State of Maine amended the complaint to remove language identifying the victim as a family or household member (ECF No. 304-2), but maintained the charge against Minor under Maine's domestic violence assault statute. Minor pleaded no contest to assault on June 14, 2010, and was sentenced to a 113-day term of imprisonment.[2] Minor's 2010 assault conviction is now the predicate offense to his pending federal charge for possession of a firearm by a person previously convicted of a misdemeanor crime of domestic violence.[3]

The first trial on Minor's federal charge, held in late 2017, ended with the jury finding Minor guilty. (ECF No. 95). He appealed (ECF No. 120) and the First Circuit vacated his conviction and remanded (ECF No. 144) the case with the parties' agreement in light of *Rehaif v. United States*, 588 U.S. ---, 139 S. Ct. 2191 (2019), which issued while Minor's appeal was pending. In *Rehaif*, the Supreme Court held that the Government must prove a defendant charged under 18 U.S.C.A. §§ 922(g)

---

[2] Although the state court judgment (ECF No. 304-3) notes that Minor was charged under Maine's domestic violence assault statute, 17-A M.R.S.A. § 207-A, the field for "Offense(s) convicted" states simply "Assault, Cl. D" without referencing the underlying criminal statute that Minor pleaded no contest to violating. ECF No. 304-3 at 1.

[3] The parties have previously agreed that "Minor's possession of a firearm following his state [assault] conviction violated section 922(g)(9)." *United States v. Minor*, 63 F.4th 112, 118 (1st Cir. 2023) (en banc). *See also Voisine v. United States*, 579 U.S. 686, 689-90, 698-99 (2016) (affirming a conviction under section 922(g)(9) where the predicate offense was a conviction for assault under Maine's general assault statute, 17-A M.R.S.A. § 207).

and 924(a)(2)[4] knew both that he possessed a firearm and belonged to the relevant category of persons barred from possessing a firearm. After the Government filed the superseding indictment to account for the change in law under *Rehaif*, a second jury trial was held in 2020. That trial ended with a conviction (ECF No. 217), which Minor appealed (ECF No. 257). A divided First Circuit panel subsequently vacated Minor's 2020 conviction and remanded for further proceedings, *United States v. Minor*, 31 F.4th 9 (2022). The Government petitioned for a rehearing en banc, asking the full Circuit to reconsider whether the jury instructions during the 2020 trial comported with the mens rea requirement under sections 922(g)(9) and 924(a)(2). *United States v. Minor*, 63 F.4th 112, 114 (1st Cir. 2023) (en banc.). On March 23, 2023, the First Circuit granted the Government's en banc petition, and again vacated the 2020 conviction and remanded to this Court for a third round of proceedings. *Id.*

### B.   Motion to Dismiss the Superseding Indictment

Minor now moves to dismiss the superseding indictment, contending that section 922(g)(9) "is unconstitutionally broad and facially invalid in defining prohibited persons and as applied to him in violation of the Second Amendment." ECF No. 292 at 1. In support, Minor argues that because the Second Amendment protects his right as an American citizen to possess a firearm in his home, the Government must prove that restricting that right through section 922(g)(9) "is consistent with the Nation's historical tradition of firearm regulation." ECF No. 292 at 2 (quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022)).

---

[4] *See supra* note 1.

In opposing the motion (ECF No. 297), the Government argues primarily that Minor's as-applied challenge to section 922(g)(9) fails on the merits because (1) the Second Amendment's protections only apply to law-abiding citizens, which Minor—a domestic violence misdemeanant—is not; and (2) even if Minor were law-abiding, the statutory restriction barring domestic violence misdemeanants from bearing arms is consistent with this Nation's historical tradition of firearm regulation. The Government also contends that Minor's facial challenge to the statute under the overbreadth doctrine is likewise meritless because Minor has not presented circumstances under which he is entitled to bring so broad a challenge to a criminal statute.

## II.  ANALYSIS

### A.  Second Amendment Challenge

The Second Amendment to the United States Constitution protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. The Supreme Court held in *District of Columbia v. Heller* that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*." 554 U.S. 570, 635 (2008) (emphasis added). In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court established a two-step framework for assessing constitutional challenges alleging Second Amendment violations:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls

outside the Second Amendment's "unqualified command." 597 U.S. at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)). To carry its burden, the Government must point to "'historical precedent' from before, during, and . . . after the founding [that] evinces a comparable tradition of regulation." *Id.* at 27 (quoting *Heller*, 554 U.S. at 631). The Government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* In determining whether the proffered analogues are, indeed, analogous, courts "train [their] attention on two comparisons: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Ocean State Tactical, LLC v. Rhode Island*, No. 23-1072, --- F.4th ---, 2024 WL 980633, *4 (1st Cir. Mar. 7, 2024) (quoting *Bruen*, 597 at 29). Because courts do not "resolve historical questions in the abstract" but rather "resolve *legal* questions presented in particular cases or controversies," judges are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 25 n.6.

The plain text of the Second Amendment establishes a right that applies to "the people" without qualification. U.S. Const. amend. II. Recognizing, however, that "there is some debate over the extent to which the [Supreme] Court's 'law abiding' qualifier constricts the Second Amendment's reach," I assume without deciding that the Second Amendment's plain text covers Minor's conduct that the Government contends is unlawful under section 922(g)(9). *United State v. Rahimi*, 61 F.4th 443, 451 (5th Cir. 2023); *see Bruen*, 597 at 8-9 ("[T]he Second and Fourteenth Amendments

5

protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for their self-defense."); *Heller*, 554 U.S. at 635 (concluding that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). Operating under that assumption, "the Constitution presumptively protects" a domestic violence misdemeanant's right to bear arms, which puts the burden on the Government to demonstrate that section 922(g)(9) is consistent with the Nation's historical tradition of firearm regulations. *Bruen*, 597 U.S. at 24. After careful review of the historical tradition contained in the record, I conclude that the Government has met its burden.

In framing the relevant "historical tradition," the Government casts section 922(g)(9) as an heir to the distinct but related legislative legacies of disarming individuals who pose a danger to others and preventing domestic violence. As examples, the Government cites historical analogues including English common-law and colonial-era protections against spousal abuse; founding-era state laws that prevented children, the mentally ill, criminals, and other groups deemed "untrustworthy" from owning guns; and the common-law prohibition in antebellum America against "carry[ing] deadly weapons in a manner likely to terrorize others," ECF No. 297 at 11 (quoting *Bruen*, 597 U.S. at 59). Minor has not challenged the historical analogues to section 922(g)(9) advanced by the Government.

At oral argument on the motion to dismiss (ECF No. 299), the Government again identified a raft of historical analogues, including some not previously discussed in its written response to Minor's motion. I directed the Government to file

6

a supplemental brief that reduced to writing the newly-raised firearms regulations and provided Minor an opportunity to respond. The analogous regulations identified in the Government's supplemental brief (ECF No. 304) that were not discussed in its initial response include:

- The 1328 Statute of Northampton, which made some acts of "riding or going armed with dangerous or unusual weapons" punishable by "forfeiture of the arms," 4 William Blackstone, *Commentaries on the Laws of England,* 149 (10th ed. 1787), *see* ECF No. 304 at 12;

- England's Militia Act of 1662, which authorized local officials to disarm individuals deemed "dangerous to the Peace of the Kingdome," ECF No. 304 at 12 (quoting 14 Car. 2, c. 3 § 13 (1662) (Eng.));

- Failed proposals at the Pennsylvania and Massachusetts ratifying conventions for constitutional language that would have permitted the State to pass laws restricting criminals and persons who posed a threat of danger to others from bearing arms, which the Government characterizes as "reflect[ing] a contemporary belief during the Founding era that the government could disarm those who are not law-abiding, responsible citizens," ECF No. 304 at 14; *see also* 2 The Documentary History of the Ratification of the Constitution 597-98, 623-25 (M. Jensen ed. 1997) (Pennsylvania convention); 6 The Documentary History of the Ratification of the Constitution 1453 (J. Kaminski & G. Saladino eds., 2000) (Massachusetts convention);

7

- The "robust historical tradition of disarming people convicted of a 'crime of violence,'" offered with reference to a secondary source's discussion of the 1926 and 1930 Uniform Firearms Acts[5] and the Federal Firearms Act of 1938,[6] ECF No. 304 at 14 (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 699, 701 (2009)); and

- The colonial-era practice of disarming slaves and Native Americans "as a matter of course," ECF No. 304 at 16 (quoting *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J. dissenting)), which some states incorporated in their constitutions, *see* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 209-11 (2006) (compiling state constitutional provisions ratified before the Reconstruction Amendments that expressly limited the right to bear arms to "citizens," "freemen," and "free white men").

Minor does not qualify the Government's accounting of relevant historical analogues, challenge it as inaccurate, or offer counterexamples of a competing historical tradition. Based on the record before me, I conclude that the Government

---

[5] The 1930 Uniform Firearms Act, which prohibited persons convicted of a "crime of violence" from possessing any firearm with a barrel less than twelve inches long, Charles V. Imlay, *Uniform Firearms Act Reaffirmed*, 16 A.B.A. J. 799, 799 (1930), was adopted by eleven jurisdictions, including two federal jurisdictions subject to the Second Amendment, by 1938. C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Har. J.L. & Pub. Pol'y 695, 705 (2009); *see also McDonald v. Chicago*, 561 U.S. 742, 791 (2010) (expressly holding for the first time that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right to possess a handgun in the home for the purpose of self-defense and applies equally to the Federal Government and the States).

[6] Federal Firearms Act, Pub. L. No. 75-785, ch. 850 § 1(6), 52 Stat. 1250, 1250 (1938). The Federal Firearms Act of 1938 initially proscribed felons and misdemeanants convicted of a limited set of violent crimes from possessing firearms, and was amended in 1961 to, *inter alia*, omit misdemeanants from its scope. *See United States v. Booker*, 644 F.3d 12, 24 (2011).

has met its burden to show that our Nation has a historical tradition of restricting persons considered to be untrustworthy or dangerous, including persons convicted of violent offenses, such as an assault, from possessing firearms—a tradition analogous enough with the "how" and "why" of the firearms restriction in section 922(g)(9) for it to pass constitutional muster.[7]

## B.  Overbreadth Challenge

Minor also challenges section 922(g)(9) as being overbroad on its face. A law is impermissibly "overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Hightower v. City of Boston*, 693 F.3d 61, 81 (1st Cir. 2012) (quoting *United States v. Stevens*, 59 U.S. 460, 473 (2010)). "Courts 'generally do not apply the "strong medicine" of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law.'" *Id.* at 82 n.19 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

In challenging section 922(g)(9) as overbroad, Minor fails to identify a single application of section 922(g)(9) that might be arguably overbroad.[8] Accordingly, his

---

[7] Although I conclude that the Government has carried its burden, several of the proffered historical analogues miss the mark. For example, the "failed proposals" at the Pennsylvania and Massachusetts constitutional conventions that the Government cites are plainly outside the relevant historical tradition of firearm regulation "that delimits the outer bounds of the right to keep and bear arms" because they were never adopted as law. *Bruen*, 597 U.S. at 19. Additionally, several of the Government's other analogues, namely laws and customs permitting the State to disarm groups deemed dangerous or untrustworthy on the basis of a protected status, like race, are clearly unconstitutional by contemporary standards and I do not consider them as part of my analysis. *Cf. Kanter*, 919 F.3d 437, 458 n.7 (2019) (Barrett, J. dissenting).

[8] First Circuit decisions that have viewed overbreadth challenges in the Second Amendment context unfavorably lend additional support for this outcome. *See, e.g., Hightower*, 693 F.3d at 82 (rejecting overbreadth challenge to a state statutory and administrative scheme for revoking licenses to carry firearms); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (acknowledging that the Supreme

challenge is wholly undeveloped and, therefore, unavailing.

### III.  CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss the Indictment (ECF No. 292) is hereby **DENIED**.

**SO ORDERED.**

**Dated this 8th day of March, 2024.**

                                          /s/ Jon D. Levy
                                  **CHIEF U.S. DISTRICT JUDGE**

---

Court has "not recognized the 'overbreadth' doctrine outside the limited context of the First Amendment"); *United States v. Decastro*, 682 F.3d 160, 169 (2d Cir. 2012) ("There is no overbreadth argument that [the Defendant] can make in the Second Amendment context."). *But see* John F. Decker, *Overbreadth Outside the First Amendment*, 34 N.M. L. Rev. 53, 79-102 (2004) (cataloguing the "limited number of cases in which the [Supreme] Court used overbreadth or any analysis paralleling overbreadth to strike down statutes that were infringing upon rights falling outside the scope of the First Amendment" without identifying examples in the Second Amendment context).